# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                       No. CR 21-0306 JB

DASHAE HAMPTON,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Sentencing Memorandum, Objections, and Request for Variance, filed June 27, 2022 (Doc. 74)("Objection"). The primary issue is whether the United States Probation Office ("USPO") calculates correctly Defendant Dashae Hampton's base offense level as 20, where Hampton possessed a firearm in violation of 18 U.S.C. § 922(g)(1) and the firearm is a semiautomatic pistol with a high capacity magazine. The Court concludes that the USPO calculates correctly Hampton's base offense level as 20, because United States Sentencing Guidelines ("U.S.S.G.") § 2K2.1(a)(4)(B) states that the base offense level for an 18 U.S.C. § 922(g)(1) violation is 20 if the offense involves a "semiautomatic firearm that is capable of accepting a large capacity magazine," where a magazine that holds more than fifteen rounds is a large capacity magazine. U.S.S.G. § 2K2.1(a)(4)(B). See U.S.S.G. § 2K2.1 cmt. n.2. Accordingly, the Court will overrule the Objection.

## LAW REGARDING THE GUIDELINES

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court of the United States of America severed the mandatory provisions from the Sentencing Reform Act, Pub. L. No. 98-473, 98 Stat. 1976, thus making the Guidelines sentencing ranges effectively advisory. In excising the two sections, the Supreme Court left the remainder of the Sentencing Reform Act intact,

including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing.  Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable."  United States v.  Booker, 543 U.S.  at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary" to comply with four statutorily defined purposes enumerated in 18 U.S.C. § 3553(a)(2):

> (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)    to afford adequate deterrence to criminal conduct;
>
> (C)    to protect the public from further crimes of the defendant; and
>
> (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

> [A] defendant who has been found guilty of an offense described in any Federal statute . . .  shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

18 U.S.C. § 3551.  To achieve these purposes, § 3553(a) directs sentencing courts to consider: (i) the Guidelines; (ii) the offense's nature and the nature of the defendant's character; (iii) the available sentences; (iv) the policy favoring uniformity in sentences for defendants who commit similar crimes; (v) the need to provide restitution to victims; and (vi) any pertinent United States Sentencing Commission policy statements in effect on the date of sentencing.  See 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines are no longer mandatory, both the Supreme Court and the United

States Court of Appeals for the Tenth Circuit have clarified that, while the Guidelines are one of several factors which § 3553(a) enumerates, they are entitled to careful consideration.  See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir.  2006)(describing the Guidelines as more than "just one factor among many").  They are significant, because "the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . .  [and] represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses."  United States v. Cage, 451 F.3d at 593 (internal quotation marks omitted)(quoting United States v. Terrell, 445 F.3d 1261, 1265 (10th Cir.  2006)). A reasonable sentence is one that also "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a).  See United States v. Booker, 543 U.S.  at 261-62.

The Tenth Circuit has "joined a number of other circuits in holding that a sentence within the applicable Guidelines range is presumptively reasonable."  United States v.  Terrell, 445 F.3d 1261, 1264 (10th Cir.  2006), overruled on other grounds by Rita v.  United States, 551 U.S. at 349, as recognized in United States v.  Zamora-Solorzano, 528 F.3d 1247, 1251, n.3 (10th Cir. 2008).  This presumption, however, is an appellate presumption, and not one that the trial court can or should apply.  See Gall v. United States, 552 U.S.  38, 46-47 (2007); Kimbrough v. United States, 552 U.S.  85, 90-91 (2007); Rita v. United States, 551 U.S.  at 351.  Instead, the trial court must undertake the § 3553(a) balancing of factors without any presumption in favor of the

advisory[1] Guidelines sentence.  See Rita v. United States, 551 U.S.  at 351; Gall v. United States,

---

[1]Attorneys and courts often say that the "Guidelines" are advisory, but it appears more appropriate to say that the resulting Guidelines ranges are advisory.  Gall v. United States, 552 U.S.  at 46 ("As a result of our decision [in United States v. Booker], the Guidelines are now advisory . . . ."); United States v. Leroy, 298 F.  App'x 711, 712 (10th Cir. 2008)(unpublished)("[T]he Guidelines are advisory, not mandatory."); United States v. Sells, 541 F.3d 1227, 1237 (10th Cir.  2008)("[T]he sentence ultimately imposed by the district court was based on a correctly calculated Guidelines range, a stated consideration of the § 3553(a) factors, and an understanding that the Guidelines are advisory.").  The Court must consider the Guidelines, see Gall v. United States, 552 U.S.  at 46 ("It is . . .  clear that a district judge must give serious consideration to the extent of any departure from the Guidelines . . . ."), and must accurately calculate the Guidelines range, see Gall v. United States, 552 U.S.  at 49 ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.").  The Court is not mandated, however, to apply a sentence within the calculated Guidelines range.  See United States v. Sierra-Castillo, 405 F.3d 932, 936 n.2 (10th Cir.  2005)("[D]istrict courts post-Booker have discretion to assign sentences outside of the Guidelines-authorized range . . . .").  Accord United States v. Chavez-Rodarte, No.  CR 08-2499 JB, 2010 WL 3075285, at *2-3 (D.N.M.  July 16, 2010)(Browning, J.).

The Court must adhere to the following three-step sequence when sentencing a criminal defendant: first, determining the appropriate sentencing range on the basis of Guidelines' chapters 2 through 4; next, applying Guidelines-contemplated departures based on parts 5H and 5K; and, only then, varying from the Guidelines framework on the basis of the § 3553(a) factors taken as a whole.  The Court must follow this sequence, because: (i) the Guidelines expressly provide for it, and courts must still consult the Guidelines, even if they will subsequently vary from them in the third step of the sequence; and (ii) adherence to this sequence is the only way to give effect to 18 U.S.C.  § 3553(e).

. . . .

The Supreme Court held in United States v.  Booker that "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing," 543 U.S.  at 264, but further expounded in Kimbrough v.  United States that "courts may vary [from the Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines," 552 U.S. 85, 101 (2007)(alteration in original)(internal quotation marks omitted).  In theory, this freedom could mean that a district court may excise individual portions of the Guidelines along the way as it performs an otherwise by-the-book Guidelines analysis, end up with a sentence with built-in variances, and never even know what sentence a true, rigid Guidelines application would yield.  In practice, however, appellate courts expect district courts to first obtain the true Guidelines' sentence range and circumscribe their United States v.  Booker-granted authority to post-

552 U.S. at 46-47; <u>Kimbrough v. United States</u>, 552 U.S. at 90-91.

> While the Supreme Court's decision in <u>United States v. Booker</u> has given the sentencing court discretion that it did not have earlier, the sentencing court's first task remains to accurately and correctly determine the advisory-Guideline sentence. Thus, before the sentencing court takes up a defendant's <u>Booker</u> arguments, the sentencing court must first determine whether the defendant is entitled to downward departures. The sentencing court may, however, also use these same departure factors in the <u>Booker</u> calculus, even if the court does not grant a downward departure.

<u>United States v. Apodaca-Leyva</u>, No. CR 07-1479 JB, 2008 WL 2229550, at *6 (D.N.M. Feb. 13, 2008)(Browning, J.). The Supreme Court has recognized, however, that sentencing judges are "in a superior position to find facts and judge their import under § 3553(a) in each particular case." <u>Kimbrough v. United States</u>, 552 U.S. at 89. Applying § 3553(a)'s factors, the Court has concluded that the case of an undocumented immigrant who unlawfully re-entered the United States to provide for his two children and two siblings was not materially different from other re-entry cases, and, thus, no variance from the Guidelines sentence was warranted. <u>See United States v. Almendares-Soto</u>, No. CR 10-1922 JB, 2010 WL 5476767, at *12 (D.N.M. December 14, 2010)(Browning, J.). On the other hand, in <u>United States v. Jager</u>, No. CR 10-1531 JB, 2011 WL 831279 (D.N.M. February 17, 2011)(Browning, J.), although the defendant's military service was

---

Guidelines analysis "variances." <u>Irizarry v. United States</u>, 553 U.S. 708, 710-16 (2008). A district court that attempts to vary from U.S.S.G. § 1B1.1's basic sequence most likely acts procedurally unreasonably. <u>See Gall v. United States</u>, 552 U.S. 38, 51 (2007)(holding that a sentence is procedurally reasonable if "the district court committed no significant procedural error, <u>such as failing to calculate (or improperly calculating) the Guidelines range</u>, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence" (emphasis added)).

<u>United States v. Nolf</u>, 30 F. Supp. 3d 1200, 1222-24, (D.N.M. June 20, 2014)(Browning, J.)(emphasis in original).

not present to an unusual degree and, thus, did not warrant a departure, the Court concluded that a variance was appropriate, because the defendant's military service was "superior and uniformly outstanding," as the defendant appeared to have been "trustworthy[] and dedicated, and he served with distinction."  2011 WL 831279, at *14.

## LAW REGARDING DOWNWARD DEPARTURES

The Guidelines "place essentially no limit on the number of potential factors that may warrant a departure."  Koon v. United States, 518 U.S. 81, 106 (1996). See United States v. Coleman, 188 F.3d 354, 358 (6th Cir. 1999)(en banc)(stating that there are a "potentially infinite number of factors which may warrant a departure"); 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.").  A departure is warranted if the case is "unusual enough for it to fall outside the heartland of cases in the Guideline."  Koon v. United States, 518 U.S. at 92. Accord United States v. Lewellen, No. CR 11-1524 JB, 2012 WL 2175769, at *5 (D.N.M. June 5, 2012)(Browning, J.).

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.  We do not understand it to have been the congressional purpose to withdraw all sentencing discretion from the United States district judge.

Koon v. United States, 518 U.S. at 113.

For example, in United States v. Jim, 877 F. Supp. 2d 1018 (D.N.M. 2012)(Browning, J.), the Court did not grant a defendant's request for a downward departure under U.S.S.G. § 4A1.3(b), where the defendant argued that his criminal history category over-represented the seriousness of

his criminal history and the likelihood that he would commit other crimes.  See 877 F. Supp. 2d at 1044-45.  The Court noted that Jim's criminal history included: (i) two DWI convictions; (ii) a conviction for Roadway Laned Traffic; and (iii) Abandonment or Abuse of a Child. See 877 F. Supp. 2d at 1044-45. The Court concluded that a criminal history category of II did not over-represent Jim's criminal history, explaining that Jim's previous convictions involved alcohol and driving, demonstrating a pattern of aberrant use of alcohol also seen in the offense for which he was sentenced -- sexual assault -- as Jim asserted that both he and the victim were intoxicated at the time he assaulted the victim. See 877 F. Supp. 2d at 1022-23, 1044-45.  The Court noted that it "does not take much for a defendant to qualify for a criminal history category of II" and that the Court could not distinguish Jim's criminal history from that of other defendants that the Court regularly sees who also have a criminal history category of II, and thus denied Jim's request for a downward departure under U.S.S.G. § 4A1.3. 877 F. Supp. 2d at 1044-45.

In United States v. Jager, No. CR 10-1531 JB, 2011 WL 831279 (D.N.M. February 17, 2011)(Browning, J.), the Court denied a defendant's request for a downward departure, under U.S.S.G. § 5H1.11, based upon the defendant's eleven years of military service. See 2011 WL 831279, at *3.  Even though Jager had received exemplary reviews in his performance reports, earning either the highest or second highest ratings possible, during his military career, the Court concluded that his service was not present in an unusual degree or distinguishable from other cases which the Guidelines cover.  United States v. Jager, 2011 WL 831279, at * 11.  The Court noted that in many child pornography cases, such as Jager's, the defendant leads an exemplary life publicly, while engaging in a sordid secret life privately.  United States v. Jager, 2011 WL 831279, at * 11.   Jager's case was thus not distinguishable from other defendants sentenced under the Guidelines.  United States v. Jager, 2011 WL 831279, at * 11.  Additionally, Jager was not in

intense combat during his military career, most of his time was spent in the support role of a mechanic.  United States v. Jager, 2011 WL 831279, at * 11.  The Court concluded, thus, that Jager's military service did not distinguish his case from those of many other defendants who commit child pornography, and the Court denied Jager's request for a downward departure.  See 2011 WL 831279, at *10-11.

### LAW REGARDING VARIANCES FROM THE SENTENCING GUIDELINES

After United States v. Booker, 543 U.S. 220 (2005), the sentencing guideline ranges are now advisory and are one of several factors set out in 18 U.S.C. § 3553(a).  Although appellate courts are allowed to assume that within-guidelines sentences are reasonable, subject to rebuttal, see Gall v. United States, 552 U.S. 38, 50-51 (2007), the Supreme Court has made it clear that no presumption of reasonableness attaches at the district court level to the sentence the Guidelines suggest, see Gall v. United States, 552 U.S. at 50 (explaining that a sentencing judge "may not presume that the Guidelines range is reasonable"); Rita v. United States, 551 U.S. 338, 351 (2007)("In determining the merits of [the parties'] arguments, the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply.").  Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary" to comply with four statutorily defined purposes enumerated in 18 U.S.C. § 3553(a)(2):

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D). Section 3553(a) also directs sentencing courts to consider: (i) the

nature of the offense and the defendant's character; (ii) the available sentences; (iii) the Sentencing

Guidelines and policy statements that the Sentencing Commission has promulgated; (iv) a policy

favoring uniformity in sentences for defendants who commit similar crimes; and (v) the need to

provide restitution to victims.  See 18 U.S.C. § 3553(a)(1), (3)-(7).

**LAW REGARDING JUDICIAL REVIEW OF AGENCY LEGAL INTERPRETATIONS**

Under the Administrative Procedure Act, 5 U.S.C. §§ 551-559, 701-06, 1305, 3105, 3344,

4301, 5335, 5372, 7521 ("APA"), APA,

> [a] person suffering legal wrong because of agency action, or adversely affected or
> aggrieved by agency action within the meaning of a relevant statute, is entitled to
> judicial review thereof.  An action in a court of the United States seeking relief
> other than money damages and stating a claim that an agency or an officer or
> employee thereof acted or failed to act in an official capacity or under color of legal
> authority shall not be dismissed nor relief therein be denied on the ground that it is
> against the United States or that the United States is an indispensable party.  The
> United States may be named as a defendant in any such action, and a judgment or
> decree may be entered against the United States: *Provided*, that any mandatory or
> injunctive decree shall specify the Federal officer or officers (by name or by title),
> and their successors in office, personally responsible for compliance.  Nothing
> herein (1) affects other limitations on judicial review or the power or duty of the
> court to dismiss any action or deny relief on any other appropriate legal or equitable
> ground; or (2) confers authority to grant relief if any other statute that grants consent
> to suit expressly or impliedly forbids the relief which is sought.

5 U.S.C. § 702 (emphasis in original).  The APA states that district courts can:

> (1)     compel agency action unlawfully withheld or unreasonably delayed; and
>
> (2)     hold unlawful and set aside agency action, findings, and conclusions found
> to be --
>
> > (A)     arbitrary, capricious, an abuse of discretion, or otherwise not
> > in accordance with law;
> >
> > (B)     contrary to constitutional right, power, privilege, or
> > immunity;
> >
> > (C)     in excess of statutory jurisdiction, authority, or limitations,
> > or short of statutory right;

(D)     without observance of procedure required by law;

(E)     unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F)     unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706.

Under Olenhouse v. Commodity Credit Corp., 42 F.3d 1560 (10th Cir. 1994), "[r]eviews of agency action in the district courts [under the APA] must be processed *as appeals*.  In such circumstances the district court should govern itself by referring to the Federal Rules of Appellate Procedure." 42 F.3d at 1580 (emphasis in original).  See WildEarth Guardians v. U.S. Forest Serv., 668 F. Supp. 2d 1314, 1323 (D.N.M. 2009)(Browning, J.).   "As a group, the devices appellate courts normally use are generally more consistent with the APA's judicial review scheme than the devices that trial courts generally use, which presume nothing about the case's merits and divide burdens of proof and production almost equally between the plaintiff and defendant." N. New Mexicans Protecting Land & Water Rights v. United States, No. CIV 15-0559, 2015 WL 8329509, at *9 (D.N.M. Dec. 4, 2015)(Browning, J.).

In promulgating and enforcing regulations, agencies must interpret federal statutes, their own regulations, and the Constitution of the United States, and Courts reviewing those interpretations apply three different deference standards, depending on the kind of law at issue. First, the federal judiciary accords considerable deference to an agency's interpretation of a statute that Congress has tasked it with enforcing.  See United States v. Undetermined Quantities of Bottles of an Article of Veterinary Drug, 22 F.3d 235, 238 (10th Cir. 1994).  This doctrine is known as Chevron deference, named after the supposedly seminal case, Chevron, U.S.A., Inc. v. Natural

Resource Defense Council, Inc., 467 U.S. 837 (1984)("Chevron").[2]  Chevron deference is a two-

step process[3] that first asks whether the statutory provision in question is clear and, if it is not, then

asks whether the agency's interpretation of the unclear statute is reasonable; as the Tenth Circuit

has explained,

> we must be guided by the directives regarding judicial review of administrative
> agency interpretations of their organic statutes laid down by the Supreme Court in
> *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S.
> 837 . . . (1984).  Those directives require that we first determine whether Congress
> has directly spoken to the precise question at issue.  If the congressional intent is
> clear, we must give effect to that intent.  If the statute is silent or ambiguous on that
> specific issue, we must determine whether the agency's answer is based on a
> permissible construction of the statute.

United States v. Undetermined Quantities of Bottles of an Article of Veterinary Drug, 22 F.3d at

238 (citing Chevron, 467 U.S. at 842-43).

---

[2]The case itself is unremarkable, uninstructive, does not explicitly outline the now-familiar two-step process of applying Chevron deference, and does not appear to have been intended to become a "big name" case at all.  Its author, the Honorable John Paul Stevens, former Associate Justice of the Supreme Court of the United States, insists that the case was never intended to create a regime of deference, and, in fact, Justice Stevens became one of Chevron deference's greatest detractors in subsequent years.  See generally Charles Evans Hughes, Justice Stevens and the Chevron Puzzle, 106 Nw. U. L. Rev. 551 (2012).

[3]There is, additionally, a threshold step -- the so-called "step zero" -- which asks whether Chevron deference applies to the agency decision at all.  See Cass R. Sunstein, Chevron Step Zero, 92 Va. L. Rev. 187 (2006).  Step zero asks: (i) whether the agency is Chevron-qualified, meaning whether the agency involved is the agency charged with administering the statute -- for example, the EPA administers a number of statutes, among them the Clean Air Act, Pub. L. No. 88-206, 77 Stat. 392; (ii) whether the decision fits within the category of interpretations afforded the deference -- interpretation of contracts, the Constitution, and the agency's own regulations are not afforded Chevron deference, see, e.g., U.S. West, Inc. v. FCC, 182 F.3d 1224 (10th Cir. 1999)("[A]n unconstitutional interpretation is not entitled to *Chevron* deference."); and (iii) whether Congress intended the agency to "speak with the force of law" in making the decision in question, United States v. Mead Corp., 533 U.S. 218, 229 (2001) -- opinion letters by the agency, for example, do not speak with the force of law and are thus not entitled to Chevron deference, see Christensen v. Harris Cty., 529 U.S. 576 (2000).  An affirmative answer to all three inquiries results in the agency's decision passing step zero.

Chevron's second step is all but toothless, because if the agency's decision makes it to step two, it is upheld almost without exception.  See Jason J. Czarnezki, An Empirical Investigation of Judicial Decisionmaking, Statutory Interpretation, and the Chevron Doctrine in Environmental Law, 79 U. Colo. L. Rev. 767, 775 (2008)("Due to the difficulty in defining step two, courts rarely strike down agency action under step two, and the Supreme Court has done so arguably only twice."); Ronald M. Levin, The Anatomy of Chevron: Step Two Reconsidered, 72 Chi.-Kent L. Rev. 1253, 1261 (1997)("[T]he Court has never once struck down an agency's interpretation by relying squarely on the second Chevron step.").  Courts essentially never conclude that an agency's interpretation of an unclear statute is unreasonable.

Chevron's first step, in contrast, has bite, but there is substantial disagreement about what it means.  The Court has noted the varying approaches that different Supreme Court Justices have taken in applying Chevron deference:

> The Court notices a parallel between the doctrine of constitutional avoidance and the Chevron doctrine.  Those Justices, such as [Honorable Antonin Scalia, former Associate Justice of the Supreme Court,] who are most loyal to the doctrines and the most likely to apply them, are also the most likely to keep the "steps" of the doctrines separate: first, determining whether the statute is ambiguous; and, only then, assessing the merits of various permissible interpretations from the first step.  These Justices are also the most likely to find that the statute is unambiguous, thus obviating the need to apply the second step of each doctrine.  Those Justices more likely to find ambiguity in statutes are more likely to eschew applying the doctrines in the first place, out of their distaste for their second steps -- showing heavy deference to agencies for Chevron doctrine, and upholding facially overbroad statutes, for constitutional avoidance.

Griffin v. Bryant, 30 F. Supp. 3d 1139, 1192 n.23 (D.N.M. 2014)(Browning, J.).  A number of policy considerations animate Chevron deference, among them: (i) statutory interpretation, i.e., that Congress, by passing extremely open-ended and vague organic statutes, grants discretionary power to the agencies to fill in the statutory gaps; (ii) institutional competency, i.e., that agencies

are more competent than the courts at filling out the substantive law in their field; (iii) political accountability, i.e., that agencies, as executive bodies ultimately headed by the President of the United States, can be held politically accountable for their interpretations; and (iv) efficiency, i.e., that numerous, subject-matter specialized agencies can more efficiently promulgate the massive amount of interpretation required to maintain the modern regulatory state -- found in the Code of Federal Regulations and other places -- than a unified but Circuit-fragmented federal judiciary can.

Second, when agencies interpret their own regulations -- to, for example, adjudicate whether a regulated party complied with them -- courts accord agencies what is known as Auer or Seminole Rock deference.  See Auer v. Robbins, 519 U.S. 452 (1997)("Auer"); Bowles v. Seminole Rock & Sand Co., 325 U.S. 410 (1945)("Seminole Rock").  This deference is applied in the same manner as Chevron deference and is substantively identical.  There would be little reason to have a separate name for this doctrine, except that its logical underpinnings are much shakier, and its future is, accordingly, more uncertain.  Justice Scalia, after years of applying the doctrine followed by years of questioning its soundness, finally denounced Auer deference in 2013 in his dissent in Decker v. Northwest Environmental Defense Center, 568 U.S. 597 (2013).  The Court cannot describe the reasons for Justice Scalia's abandonment of the doctrine better than the Justice himself:

> For decades, and for no good reason, we have been giving agencies the authority to say what their rules mean, under the harmless-sounding banner of "defer[ring] to an agency's interpretation of its own regulations."  This is generally called *Seminole Rock* or *Auer* deference.
>
> . . . .
>
> The canonical formulation of *Auer* deference is that we will enforce an agency's interpretation of its own rules unless that interpretation is "plainly erroneous or inconsistent with the regulation."  But of course whenever the agency's interpretation of the regulation is different from the fairest reading, it is in

that sense "inconsistent" with the regulation.  Obviously, that is not enough, or there would be nothing for *Auer* to do.  In practice, *Auer* deference is *Chevron* deference applied to regulations rather than statutes.  The agency's interpretation will be accepted if, though not the fairest reading of the regulation, it is a plausible reading -- within the scope of the ambiguity that the regulation contains.

Our cases have not put forward a persuasive justification for *Auer* deference. The first case to apply it, *Seminole Rock,* offered no justification whatever -- just the *ipse dixit* that "the administrative interpretation . . . becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation." Our later cases provide two principal explanations, neither of which has much to be said for it.  First, some cases say that the agency, as the drafter of the rule, will have some special insight into its intent when enacting it.  The implied premise of this argument -- that what we are looking for is the agency's *intent* in adopting the rule -- is false.  There is true of regulations what is true of statutes.  As Justice Holmes put it: "[w]e do not inquire what the legislature meant; we ask only what the statute means."  Whether governing rules are made by the national legislature or an administrative agency, we are bound *by what they say*, not by the unexpressed intention of those who made them.

The other rationale our cases provide is that the agency possesses special expertise in administering its "complex and highly technical regulatory program." That is true enough, and it leads to the conclusion that agencies and not courts should make regulations.  But it has nothing to do with who should interpret regulations -- unless one believes that the purpose of interpretation is to make the regulatory program work in a fashion that the current leadership of the agency deems effective.  Making regulatory programs effective is the purpose of *rulemaking*, in which the agency uses its "special expertise" to formulate the best rule.  But the purpose of interpretation is to determine the fair meaning of the rule -- to "say what the law is."  Not to make policy, but to determine what policy has been made and promulgated by the agency, to which the public owes obedience. Indeed, since the leadership of agencies (and hence the policy preferences of agencies) changes with Presidential administrations, an agency head can only be sure that the application of his "special expertise" to the issue addressed by a regulation *will be given effect* if we adhere to predictable principles of textual interpretation rather than defer to the "special expertise" of his successors.  If we take agency enactments as written, the Executive has a stable background against which to write its rules and achieve the policy ends it thinks best.

Another conceivable justification for *Auer* deference, though not one that is to be found in our cases, is this: If it is reasonable to defer to agencies regarding the meaning of statutes that *Congress* enacted, as we do per *Chevron*, it is *a fortiori* reasonable to defer to them regarding the meaning of *regulations that they themselves crafted*.  To give an agency less control over the meaning of its own

regulations than it has over the meaning of a congressionally enacted statute seems quite odd.

But it is not odd at all. The theory of *Chevron* (take it or leave it) is that when Congress gives an agency authority to administer a statute, including authority to issue interpretive regulations, it implicitly accords the agency a degree of discretion, which the courts must respect, regarding the meaning of the statute. While the implication of an agency power to clarify the statute is reasonable enough, there is surely no congressional implication that the agency can resolve ambiguities in its own regulations. For that would violate a fundamental principle of separation of powers -- that the power to write a law and the power to interpret it cannot rest in the same hands. "When the legislative and executive powers are united in the same person . . . there can be no liberty; because apprehensions may arise, lest the same monarch or senate should enact tyrannical laws, to execute them in a tyrannical manner." Congress cannot enlarge its *own* power through *Chevron* -- whatever it leaves vague in the statute will be worked out *by someone else*. *Chevron* represents a presumption about who, as between the Executive and the Judiciary, that someone else will be. (The Executive, by the way -- the competing political branch -- is the less congenial repository of the power as far as Congress is concerned.) So Congress's incentive is to speak as clearly as possible on the matters it regards as important.

But when an agency interprets its own rules -- that is something else. Then the power to prescribe is augmented by the power to interpret; and the incentive is to speak vaguely and broadly, so as to retain a "flexibility" that will enable "clarification" with retroactive effect. "It is perfectly understandable" for an agency to "issue vague regulations" if doing so will "maximiz[e] agency power." Combining the power to prescribe with the power to interpret is not a new evil: Blackstone condemned the practice of resolving doubts about "the construction of the Roman laws" by "stat[ing] the case to the emperor in writing, and tak[ing] his opinion upon it." And our Constitution did not mirror the British practice of using the House of Lords as a court of last resort, due in part to the fear that he who has "agency in passing bad laws" might operate in the "same spirit" in their interpretation. *Auer* deference encourages agencies to be "vague in framing regulations, with the plan of issuing 'interpretations' to create the intended new law without observance of notice and comment procedures." *Auer* is not a logical corollary to *Chevron* but a dangerous permission slip for the arrogation of power.

It is true enough that *Auer* deference has the same beneficial pragmatic effect as *Chevron* deference: The country need not endure the uncertainty produced by divergent views of numerous district courts and courts of appeals as to what is the fairest reading of the regulation, until a definitive answer is finally provided, years later, by this Court. The agency's view can be relied upon, unless it is, so to speak, beyond the pale. But the duration of the uncertainty produced by a vague regulation need not be as long as the uncertainty produced by a vague statute. For

as soon as an interpretation uncongenial to the agency is pronounced by a district court, the agency can begin the process of amending the regulation to make its meaning entirely clear.  The circumstances of this case demonstrate the point. While these cases were being briefed before us, EPA issued a rule designed to respond to the Court of Appeals judgment we are reviewing.  It did so (by the standards of such things) relatively quickly: The decision below was handed down in May 2011, and in December 2012 the EPA published an amended rule setting forth in unmistakable terms the position it argues here.  And there is another respect in which a lack of *Chevron*-type deference has less severe pragmatic consequences for rules than for statutes.  In many cases, when an agency believes that its rule permits conduct that the text arguably forbids, it can simply exercise its discretion not to prosecute.  That is not possible, of course, when, as here, a party harmed by the violation has standing to compel enforcement.

In any case, however great may be the efficiency gains derived from *Auer* deference, beneficial effect cannot justify a rule that not only has no principled basis but contravenes one of the great rules of separation of powers: He who writes a law must not adjudge its violation.

Decker v. Nw. Envtl. Def. Ctr., 568 U.S. at 616-21 (Scalia, J., dissenting)(alterations and emphasis in original)(citations omitted).  Although the Court shares Justice Scalia's concerns about Auer deference, it is, for the time being, the law of the land, and, as a federal district court, the Court must apply it.

Last, courts afford agencies no deference in interpreting the Constitution.  See U.S. W., Inc. v. FCC, 182 F.3d 1224, 1231 (10th Cir. 1999)("[A]n unconstitutional interpretation is not entitled to *Chevron* deference. . . . [D]eference to an agency interpretation is inappropriate not only when it is conclusively unconstitutional, but also when it raises serious constitutional questions." (citing, e.g., Rust v. Sullivan, 500 U.S. 173, 190-91 (1991))).  Courts have superior competence in interpreting -- and constitutionally vested authority and responsibility to interpret -- the Constitution's content.  The presence of a constitutional claim does not take a court's review outside of the APA, however -- § 706(2)(B) specifically contemplates adjudication of constitutional issues -- and courts must still respect agency fact-finding and the administrative

record when reviewing agency action for constitutional infirmities; they just should not defer to the agency on issues of substantive legal interpretation.  See, e.g., Robbins v. U.S. Bureau of Land Mgmt., 438 F.3d 1074, 1085 (10th Cir. 2006)("We review Robbins' [constitutional] due process claim against the [agency] under the framework set forth in the APA.").

## ANALYSIS

Hampton objects to the USPO's recommendation that the Court calculate his base offense level as 20, arguing that the Court "should reject the advice of the guidelines because they are a poor guide to the minimally sufficient sentence for Mr. Hampton."  Objection at 2.  According to Hampton, although he "possessed a partially loaded, 16+1 round magazine that comes standard with the Smith & Wesson, model SD9, 9mm pistol," Objection at 5, which is a semiautomatic firearm, see Presentence Investigation Report ¶ 9, at 5, filed April 8, 2022 (Doc. 68)("PSR"), the Court should not calculate the U.S.S.G. sentencing range, because "the 15-round cutoff is an arbitrary number not based on empirical data or national experience," Objection at 6.  Hampton asks the Court to "reject" U.S.S.G.'s "'large capacity magazine'" definition "as unworthy of controlling weight" and, instead, calculate his base offense level as 14 under U.S.S.G. § 2K2.1(a)(6), because he is a "prohibited person."  Objection at 10 (no citation for quotation).

U.S.S.G. § 1B1.1 states that a court "shall determine the kinds of sentence and the guideline range as set forth in" 18 U.S.C. § 3553(a)(4) "by applying the provisions of this manual" in a specific order.  U.S.S.G. § 1B1.1(a).  First, a court must determine, pursuant to U.S.S.G. § 1B1.2, the offense guideline section from U.S.S.G. Chapter Two.  See U.S.S.G. § 1B1.1(a)(1).  Second, a court must "[d]etermine the base offense level and apply any appropriate specific offense characteristics, cross references, and special instructions contained in the particular guideline in Chapter Two in the order listed."  U.S.S.G. § 1B1.1(a)(2).  Not following this order is a "significant

procedural error."  Gall v. United States, 552 U.S. 38, 51 (2007).

Although the U.S.S.G.'s sentencing ranges are advisory, and courts may choose to vary from the sentencing range based on policy considerations, see Kimbrough v. United States, 552 U.S. 85, 101-02 (2007), a defendant's sentence must be substantively and procedurally reasonable, see United States v. Booker, 543 U.S. 220, 260-61 (2005).  See Gall v. United States, 552 U.S. at 51.  Procedural error "includes 'failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence -- including an explanation for any deviation from the Guidelines range.'"  United States v. Sanchez-Leon, 764 F.3d 1248, 1261 (10th Cir. 2014)(quoting Gall v. United States, 552 U.S. at 51).  Accordingly, a sentencing court must calculate the U.S.S.G. range when sentencing a defendant, even if the court acknowledges that a policy disagreement, a departure, or a variance warrants sentencing outside the U.S.S.G. range.

The USPO calculates correctly Hampton's base offense level as 20.  On February 2, 2022, Hampton pled guilty to one count of being a felon in possession, in violation of 18 U.S.C. §§ 922(g)(1) and 924.  See Plea Minute Sheet at 1, filed February 1, 2022 (Doc. 64); PSR ¶ 2, at 4.  According to U.S.S.G. § 2K2.1, the base offense level for a violation of 18 U.S.C. §§ 922(g)(1) and 924 is 20.  See U.S.S.G. App. A.  U.S.S.G. § 2K2.1 states that the base offense level is 20 if the offense involved a "semiautomatic firearm that is capable of accepting a large capacity magazine."  U.S.S.G. § 2K2.1(a)(4)(B)(i).  A "semiautomatic firearm that is capable of accepting a large capacity magazine" means

> a semiautomatic firearm that has the ability to fire many rounds without reloading because at the time of the offense (A) the firearm had attached to it a magazine or similar device that could accept more than 15 rounds of ammunition; or (B) a

> magazine or similar device that could accept more than 15 rounds of ammunition
> was in close proximity to the firearm.

U.S.S.G. § 2K2.1 cmt. n.2.  Here, Hampton possessed a "semiautomatic firearm that is capable of accepting a large capacity magazine," Addendum to the Presentence Report, filed June 28, 2022 (Doc. 75)("Addendum"), and "a magazine capable of accepting 16 rounds of ammunition," PSR ¶ 9, at 5.  Accordingly, U.S.S.G. § 2K2.1(a)(4) applies, and Hampton's base offense level is 20.

Hampton's Objection misses the mark.  Hampton objects to the U.S.S.G. base offense level, but frames it as a policy disagreement that he asks the Court to adopt.  See Objection at 2-9.  Hampton's Objection notes his disagreement with how the U.S.S.G. define large capacity magazines, asserts without citation that a magazine that holds more than fifteen rounds "is becoming a standard in gun ownership," suggests that there is no "agreed-upon technical definition" of a large capacity magazine, and contends that the U.S.S.G.'s definition "contradicts explicit congressional action" and alleges that, because the definition appears in the U.S.S.G. commentary, it "goes too far" and the Court instead should apply the rule of lenity.  Objection at 6-10.  In response, the United States indicates that it is "unable to find discussion of the reasoning behind" the U.S.S.G.'s "selection of the specific number as the tipping point for 'large capacity magazine' designation."  United States Response to Defendant's Sentencing Memorandum, filed August 25, 2022 (Doc. 79)("Response")(no citation for quotation).  The United States' response cuts to the matter's heart: like the defendant in Kimbrough v. United States, 552 U.S. at 85, Hampton takes issue with the apparent lack of empirical support for the U.S.S.G.'s recommended sentence.  As the Honorable Ruth Bader Ginsburg, Associate Justice of the Supreme Court of the United States of America, writes in agreeing with the defendant, the United States Sentencing Commission "did not use" its "empirical approach based on data about past sentencing practices"

in formulating its sentencing recommendations for drug-trafficking offenses.  Kimbrough v. United States, 552 U.S. at 96.  Similarly, Hampton asserts that the Sentencing Commissions' decision to use a fifteen-round cutoff for large capacity magazines lacks empirical support.  See Objection at 6.  Instead, Hampton evidently would prefer the Sentencing Commission to base its sentencing ranges on how gun manufacturers choose to build their guns.  See Objection at 6 (noting that many firearm models come standard with magazines that hold as many as seventeen rounds of ammunition).  Consequently, Hampton's Objection is better framed as a Kimbrough-style disagreement.  As Justice Ginsburg writes, "[i]n carrying out its charge, the Commission fills an important institutional role: It has the capacity courts lack to "'base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise.'" Kimbrough v. United States, 552 U.S. at 109 (quoting United States v. Pruitt, 502 F.3d 1154, 1171 (10th Cir. 2007)(McConnell, J., concurring)).  Hampton's disagreement with the large capacity magazine definition is better directed at Congress and the Sentencing Commission than at the Court.

Hampton's other contention, that the U.S.S.G. large capacity magazine definition is problematic, because it is in the commentary rather than the guideline text, similarly misses the mark.  Hampton argues that the definition is not controlling, and that the Court must make an "'independent inquiry into whether the character and context of the agency interpretation entitles it to controlling weight.'"  Objection at 8 (quoting Kisor v. Wilkie, 139 S. Ct. 2400, 2416 (2019)).  Hampton, however, misunderstands the Supreme Court's holding in Kisor v. Wilkie, 139 S. Ct. at 2416.  Kisor v. Wilkie, 139 S. Ct. at 2416, does not require any and every court to assess de novo an agency interpretation of its own rules -- or here a de novo reading of the U.S.S.G. commentary.  Rather, the Honorable Elena Kagan, Associate Justice of the Supreme Court of the United States,

writes that, although Auer deference applies to most situations where an agency interprets its own rules, it is does not bestow on agencies expansive, unreviewable authority. See Kisor v. Wilkie, 139 S. Ct. at 2414.  Rather, Justice Kagan states that Auer deference applies only to ambiguous rules, and, before concluding that a rule is ambiguous, a court must first exhaust all traditional tools of statutory construction. See Kisor v. Wilkie, 139 S. Ct. at 2415.  Moreover, Justice Kagan writes that, even with Auer deference, an agency's interpretation "must still be 'reasonable.'" Kisor v. Wilkie, 139 S. Ct. at 2415 (quoting Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 515 (1994)).  Justice Kagan notes, however, that "not every reasonable agency reading of a genuinely ambiguous rule should receive Auer deference," because the Auer presumption "cannot always hold." Kisor v. Wilkie, 139 S. Ct. at 2416.  The "regulatory interpretation must be one actually made by the agency," for example. Kisor v. Wilkie, 139 S. Ct. at 2416.  In addition, the "agency's interpretation must in some way implicate its substantive expertise." Kisor v. Wilkie, 139 S. Ct. at 2416.  Finally, the agency's "reading of a rule must reflect 'fair and considered judgment' to receive Auer deference." Kisor v. Wilkie, 139 S. Ct. at 2417 (quoting Cristopher v. SmithKline Beecham Corp., 567 U.S. 142, 155 (2019)).

Justice Kagan admonishes that, although Auer requires significant deference to an agency, a court's application of Auer deference cannot amount to a thoughtless, unreasoned, and unprincipled abdication of a court's role.  Justice Kagan's opinion in Kisor v. Wilkie, 139 S. Ct. at 2416, does not mean that a court can buck Auer deference entirely and perform an independent inquiry into an agency's interpretation of its own legislative rules.  Auer deference's purpose is to prevent a court from substituting its own reading of an agency's legislative rules for the agency's: Auer deference "gives an agency significant leeway to say what its own rules mean." Kisor v. Wilkie, 139 S. Ct. at 2418.  Moreover, Hampton's invitation that the Court perform an independent

inquiry into U.S.S.G. § 2K2.1 cmt. n.2 runs headlong into the Supreme Court's statement in Stinson v. United States that Commentary to the Sentencing Guidelines "must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'"  Stinson v. United States, 508 U.S. 36, 45 (1993)(quoting Bowles v. Seminole Rock & Sand Co., 32 U.S. 410, 414 (1945)).  Although the Court has expressed concern about Auer deference, see, e.g., Mahon v. Agentra LLC, 400 F. Supp. 3d 1189, 1118-24 (D.N.M. 2019)(Browning, J.), it is the "law of the land, and, as a federal district court, the Court" must apply it, United States v. Alderete, 549 F. Supp. 3d 1289, 1296 n.2 (D.N.M. 2021)(Browning, J.).  Hampton makes no argument that the U.S.S.G. § 2K2.1 cmt. n.2 is not "reasonable," Kisor v. Wilkie, 139 S. Ct. at 2415, or "plainly erroneous or inconsistent with," Stinson v. United States, 508 U.S. at 45, U.S.S.G. § 2K2.1.

Finally, Hampton alerts the Court to a decision by the Honorable Raymond P. Moore, United States District Judge for the United States District Court for the District of Colorado, that grants a partial temporary restraining order against the Town of Superior, Colorado, for enforcing a new municipal ordinance that regulates the possession, use, transfer, and sale of certain firearms within Town limits.  See Notice of Supplemental Authority at 1, filed August 8, 2022 (Doc. 77); Rocky Mountain Gun Owners, National Ass'n for Gun Rights & Charles Bradley Walker v. The Town of Superior and Joe Pelle, No CIV 22-1685 RM (D. Colo. July 22, 2022)(Moore, J.), filed August 3, 2022 (Doc. 77-1)("Rocky Mountain Gun Owners").  Hampton asserts that Rocky Mountain Gun Owners is persuasive authority to conclude that the Court should not use U.S.S.G. § 2K2.1(a)(4)(B) to calculate his base offense level, because "large capacity magazines are constitutionally protected."  Notice of Supplemental Authority at 1.  Nowhere in Rocky Mountain Gun Owners, however, does Judge Moore discuss the U.S.S.G. or offer a reason why U.S.S.G. § 2K2.1 does not apply here.  In Rocky Mountain Gun Owners, Judge Moore concludes that, in

light of the Supreme Court's recent decision in <u>New York State Rifle & Pistol Association v.</u> <u>Bruen</u>, 142 S. Ct. 2111 (2022), the plaintiffs have a strong likelihood of success on the merits in their challenge to a provision of the Superior municipal code that "prohibits any person from knowingly possessing, selling, or otherwise transferring an 'illegal weapon.'"  <u>Rocky Mountain</u> <u>Gun Owners</u> at 7 (no citation for quotation).  Judge Moore writes that the provision at issue regulates conduct that "is covered, at least in part, by the Second Amendment," namely the "right to possess, sell, or transfer illegal weapons (which, as defined, include[s] weapons commonly used by law-abiding citizens for lawful purposes)."  <u>Rocky Mountain Gun Owners</u> at 9.

Hampton's apparent contention that this case is persuasive here is not clear, because Hampton appears to add to his <u>Kimbrough</u> argument an argument that U.S.S.G. § 2K2.1(a)(4)(B) is unconstitutional, because it instructs courts to penalize someone for possessing a large capacity magazine.  In other words, Hampton appears not to challenge his conviction under 18 U.S.C. §§ 922(g)(1) and 924, but instead contests vaguely the large capacity magazine enhancement under U.S.S.G. § 2K2.1(a)(4)(B).  In <u>New York State Rifle & Pistol Association v. Bruen</u>, the Supreme Court concludes that the "Second and Fourteenth Amendments protect an individuals' right to carry a handgun for self-defense outside the home."  <u>New York State Rifle & Pistol Ass'n v. Bruen</u>, 142 S. Ct. at 2111.  U.S.S.G. § 2K2.1(a)(4)(B) does not prohibit anybody from carrying a handgun for self-defense outside the home.  Rather, U.S.S.G. § 2K2.1(a)(4)(B) states that a person -- who is already convicted -- has a base-offense level of 20 if their offense "involved . . . a semiautomatic firearm that is capable of accepting a large capacity magazine."  U.S.S.G. § 2K2.1(a)(4)(B).  There is little connection between U.S.S.G. § 2K2.1(a)(4)(B) and the Supreme Court's decision in <u>New</u> <u>York State Rifle & Pistol Association v. Bruen</u>, 142 S. Ct. at 2111.  Even if U.S.S.G. § 2K2.1(a)(4)(B) prohibits firearm possession, Hampton needs to point to the "Anglo-American

- 23 -

history of public carry" and note the absence of "an American tradition justifying" the decision to apply a greater base offense level when someone's offense involves a semiautomatic firearm capable of accepting a large capacity magazine.  New York State Rifle & Pistol Ass'n v. Bruen, 142 S. Ct. at 2156.  Moreover, even if Hampton were to challenge 18 U.S.C. §§ 922(g)(1) and 924, or were to mount a clearer challenge to U.S.S.G. § 2K2.1(a)(4)(B), he would have to demonstrate that there are no "reasonable, well-defined restrictions" on the Second Amendment right that permit Congress from prohibiting felons from possessing firearms or getting a greater base-offense level for an offense involving a semiautomatic firearm capable of accepting a large capacity magazine.  Because Hampton does not make these arguments and the Court, on its own, sees no independent reason to adopt them, the Court concludes that Rocky Mountain Gun Owners is not persuasive here.  Hampton's Objection is a Kimbrough disagreement with the U.S.S.G., and the Court will treat it accordingly.  The Court will not accept Hampton's invitation to commit procedural error by not calculating his U.S.S.G range.

**IT IS ORDERED** that the Objection in the Defendant's Sentencing Memorandum, Objections, and Request for Variance, filed June 27, 2022 (Doc. 74), is overruled.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Alexander M.M. Uballez
    United States Attorney
Jon K. Stanford
    Assistant United States Attorney
United State Attorney's Office

Albuquerque, New Mexico

  *Attorneys for the Plaintiff*

Margaret Katze
 Federal Public Defender
Stephen A. Taylor
 Assistant Federal Public Defender
Albuquerque, New Mexico

  *Attorneys for the Defendant*